UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PERFORMANCE SOLUTIONS, LLC; 321 HOLDINGS, LLC; HALCYON BRAND SERVICES, INC., | ) ) ) | NO. 20-cv-00797-SDD-RLB<br><br>Hon. Shelly D. Dick |
| PLAINTIFFS, | ) ) ) | Mag. Richard L. Bourgeois, Jr. |
| VERSUS | ) ) | |
| SEA TIES LLC D/B/A RUMBLEROLLER, | ) ) | |
| DEFENDANT. | ) ) ) | |
| _____ | | |

**PERFORMANCE SOLUTIONS' OPENING CLAIM CONSTRUCTION BRIEF IN
SUPPORT OF CONSTRUCTIONS OF DISPUTED TERMS OF PERFORMANCE
SOLUTIONS' PATENTS**

## **TABLE OF CONTENTS**

I.    LEGAL BACKGROUND ................................................................................................ 3

II.   CLAIM TERMS FOR CONSTRUCTION ................................................................... 4

    A.    Performance Solutions' Patents ..................................................................... 4

        1.    "soft tissue" ......................................................................................... 4

        2.    "configured to" ................................................................................... 7

        3.    "two piece" ....................................................................................... 10

        4.    "cylindrically shaped core" ............................................................ 12

        5.    "closed cell foam" ........................................................................... 15

        6.    "configured to extend into soft tissue of a user" .......................... 16

        7.    "pliable" ............................................................................................ 18

        8.    "completely surrounding" .............................................................. 20

        9.    "mobilization of soft tissue" ........................................................... 21

        10.   "longitudinal axis" .......................................................................... 24

III.  CONCLUSION.......................................................................................................... 24

**Cases**

*02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1360 (Fed. Cir. 2008) ... 3, 22

*Accalarent, Inc. v. Albritton*, Case IPR2-17-00498 (Patent Tr. & App. Bd. July 9, 2018), 2018
    WL 3374755 ................................................................................................................ 8, 10

*Alloc, Inc. v. Int'l Trade Com'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ...................................... 4

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) ......... 8, 10

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455-56 (Fed. Cir. 1998) ................................. 3

*GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014) ................... 3, 22

*In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014) ............................................................ 9, 10

*In re Man Machine Interface Technologies LLC,* 822 F.3d 1202, 1286 (Fed. Cir. 2016)........ 9, 10

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) ................................ 3

*Nazomi Commc'ns., Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005) ............... 3

*NTP, Inc. v. Research In Motem, Ltd.*, 418 F.3d 1282, 1299 (Fed. Cir. 2005) .............................. 3

*Phillips*, 415 F.3d at 1312– 13 (Fed. Cir. 2005) ......................................................................... 3

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed. Cir.
    2001) ............................................................................................................................... 5

*TNS Media Research, LLC v. TiVo Research & Analytics, Inc.*, 2014-1668, at *40 (Fed. Cir. Sep.
    16, 2015) ...................................................................................................................... 2, 21

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ................................ 3

Pursuant to N.D. Cal. Local Patent Rule 4-5 and the Court's Scheduling Order (Rec. Doc. 83), Plaintiff Performance Solutions, LLC ("Performance Solutions" or "Plaintiff") hereby submits its Opening Claim Construction Brief in support of Plaintiff's constructions of Performance Solutions' patents, U.S. Patent Nos. 9,539,167 ("the '167 Patent"), 9,656,112 ("the '112 Patent"), 10,278,890 ("the '890 Patent"), and 10,695,260 ("the '260 Patent") (collectively, the "Performance Solutions' Patents").

This Claim Construction Brief is directed to Performance Solutions' constructions of the Performance Solutions' Patents.  Plaintiffs Performance Solutions, 321 Holdings, LLC and Halcyon Brand Services also seek construction of certain claim terms from two Sea Ties' patents: U.S. Patent Nos. 10,307,325 ("the '325 Patent") and 9,668,933 ("the '933 Patent") ("the Sea Ties Patents").  Since Sea Ties has declined to propose any constructions from the Sea Ties Patents, and therefore waived any objections to Plaintiffs' constructions, this Court need not consider argument for those terms, and can adopt Plaintiffs' proposed constructions.  Alternatively, Plaintiffs have provided support for their constructions in a separate filing.

Sea Ties has engaged in a pattern of uncooperative and disruptive behavior with regard to claim construction in this case that mirrors its behavior in other aspects of this case.

***First***, Sea Ties refused to engage in the claim construction process for the '325 and '933 patents.  Prior to and at the parties' November 11, 2021 meet and confer to discuss the constructions of each side's patents, Sea Ties adamantly stated that it "is not going to engage Plaintiffs with respect to the '325 Patent given that it is owned and enforced by a non-party to this

1

case."[1] As further discussed in Plaintiff's Opening Claim Construction Brief on Sea Ties' Patents, the law unequivocally provides that a party refusing to engage in the claim construction process is deemed to have waived its rights to object to any constructions that it refused to contest.

**Second**, Sea Ties did not serve any claim construction expert reports, which were due on December 13, but refuses to withdraw its reliance on any expert. Performance Solutions has filed a motion to preclude Sea Ties from relying on any expert during claim construction. Rec. Doc. 104. This motion is currently pending before this Court.

**Third,** Sea Ties has refused to negotiate in good faith to reduce the number of claims terms this Court must construe. During the meet and confer process, Sea Ties failed to provide a rationale for its proposed constructions for claim terms in the Performance Solutions patents, and failed to even respond to Plaintiff's efforts to find middle ground on certain claim terms. And now, within the last 10 days, Plaintiff has made multiple attempts at reaching out to Sea Ties regarding a potential compromise regarding the "longitudinal axis" term (*See infra*, § II.B.10) (**Exhibits L, M, O**). But these requests have gone completely ignored by Sea Ties.

**Fourth**, Sea Ties has refused to negotiate construction of an additional claim term Plaintiff identified during the course of preparing this Opening Brief, despite the fact that Plaintiff's request to have a single additional claim term construed is not out of the ordinary, and does not impose any additional burden on Sea Ties. *See TNS Media Research, LLC v. TiVo Research & Analytics, Inc.*, 2014-1668, at *40 (Fed. Cir. Sep. 16, 2015) ("[P]arties in patent cases frequently stipulate to a construction or the court construes a term, only to have their dispute evolve to a point where they

---

[1] Although the '933 Patent was not addressed in Sea Ties' email, Plaintiffs have requested a construction of certain terms in the '933 Patent. Claim construction on the '933 Patent would be helpful to the Court and/or jury in order to understand why Sea Ties' takedown of the 321 Strong rollers from Amazon in 2018 were improper. Sea Ties' misconduct, including with respect to the Amazon takedown, is subject of Plaintiffs' tort claims in this action. The same terms proposed for construction by Plaintiffs appear in both the '933 and '325 Patents.

realize that a further construction is necessary.") (*quoting GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014)); *see also 02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1360 (Fed. Cir. 2008).

## I.    LEGAL BACKGROUND

Claim construction is an issue of law. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455-56 (Fed. Cir. 1998) (*en banc*); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), aff'd 517 U.S. 370 (1996).  The Court must look to the language of the claims to determine what "the applicant regards as his invention." 35 U.S.C. § 112; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). Claim construction begins with the language of the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *NTP, Inc. v. Research In Motem, Ltd.*, 418 F.3d 1282, 1299 (Fed. Cir. 2005).

The inventor may also act as his own lexicographer and specifically define a claim term within the specification.  In such instances, the inventor's definition is controlling. *Phillips*, 415 F.3d at 1316.  The inventor may also expressly limit claim scope in the specification.  Here again the inventor's apparent intent is dispositive. *Id*. In the absence of a clear statement of intent from the inventor, when construing disputed claim terms, the Court should look first to the intrinsic record of the patent, including the claims and the specification, to determine the meaning of words in the claims. *Nazomi Commc'ns., Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368 (Fed. Cir. 2005).  The patent claims themselves "provide substantial guidance as to the meaning of particular claim terms." Id. at 1314. "[T]he words of a claim are generally given their ordinary and customary meaning … to a person of ordinary skill in the art … at the time of the invention." *Phillips*, 415 F.3d at 1312– 13 (Fed. Cir. 2005) (*en banc*). "Importantly, the person of ordinary skill in the art is deemed to read the claim term … in the context of the … entire patent, including the specification."

*Id*. at 1313. "[T]he specification is always highly relevant … . Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id*. at 1315.

The Court should also refer to the prosecution history when in evidence. *Vitronics*, 90 F.3d at 1582. Additionally, courts may also "rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. Thus, extrinsic evidence should be considered in the context of intrinsic evidence. *Id*. at 1319.

## II. CLAIM TERMS FOR CONSTRUCTION

As noted above, Plaintiff's support for their proposed constructions for claim terms from the Sea Ties Patents is provided in Plaintiff's Opening Claim Construction Brief In Support of Undisputed Constructions Of Sea Ties' Patents, which is being filed concurrently herewith. For the Court's convenience, a table showing Plaintiff's proposed constructions for claim terms for the Sea Ties Patents is also provided as **Exhibit 3**.

### A. Performance Solutions' Patents

#### 1. "soft tissue"

| Claim Term | Location in Patent(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| "soft tissue" | '167 : Claims 1, 2, and 4<br>'112 : Claims 1, 3, 4, 5, and 12<br>'890 : Claim 1<br>'260 : Claim 1 | muscles, tendons, ligaments, or fascia | Body tissue that is not hardened or calcified, including muscle, tendons, ligaments, fat, or facia |

It is a well-established canon of claim construction that courts should interpret the claims in light of the specification, yet avoid impermissibly importing limitations from the specification. *Alloc, Inc. v. Int'l Trade Com'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003). "That balance turns on how the specification characterizes the claimed invention." *Id.* In this respect, courts will consider

whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment.  *Id.*  Where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims.  *Id. citing to SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed. Cir. 2001).

The primary difference between the parties' proposed constructions is that Defendant's proposed construction incorporates every tissue in the body that is not "calcified" or bone, which would include skin and fat.  In contrast, Performance Solutions' construction is consistent with both the specifications of the patents, which describes the "targeted soft tissue" of the patented invention as including "muscles, tendons, ligaments, fascia of the human body", and the common use of the term "soft tissue". ('112 Patent, col. 8, ln. 18-21; '890 Patent, col. 8, ln. 29-32; '260 Patent, col. 8, ln. 33-36; '167 Patent, col. 5, ln. 37-40); see also Puri Decl., **Exhibit I**, Supp. Wilson Dec. at [0015] ("It is my opinion that, based on the disclosure of the ['167, '112, '890, '260] patents, "soft tissue" refers to … muscles, tendons, ligaments, and the fascial sheets and sheathes that surround and integrate them").  The specification also provides numerous examples of "soft tissue" as intended by the patent, including "the Quadriceps, Hamstrings, Rhomboids, Mid/Lower Back, Glutes/Piriformis, Hip Rotators, Hamstrings [*sic*], IT band, Calf, and Shins".  ('112 Patent, col. 5, ln. 61-65; *see also* '260 Patent, col. 6, ln. 6-13; '890 Patent, col. 6, ln. 4-8; '167 Patent, col. 5, ln. 37-40).

It is also consistent with the Examiner's findings during the ongoing reexamination proceedings related to the Performance Solutions patents, which reaffirmed that "[t]he definition of soft tissue includes muscles, tendons, ligaments, and fascial sheets", as recited in the specification and consistent with Plaintiff's proposed construction. Puri Decl. at **Exhibit H** (Dec.

5

12, 2021 Office Action in '112 Patent Reexamination, p. 31).

Defendant's construction that includes skin and fat would defeat the entire purpose of the invention if the invention were trivialized to be targeting skin or fat. For example, according to the patent specifications, "mobilization of soft tissue by the plurality of shaped projections [in the claimed inventions] massages soft tissue, decreases muscle soreness, relieves joint stress, decreases neuromuscular hypertonicity, increases joint range [of] motion and extensibility of musculotendonous junctions, optimizes soft tissue distensibility, increases neuromuscular efficiency, and helps maintain normal functional muscle length." ('112 Patent, col. 8, ln. 21-28; *see also* '167 Patent, col. 5, ln. 40-47; '260 Patent, col. 8, ln. 36-43; '890 Patent, col. 8, ln. 32-39). None of these effects would occur if the soft tissue contemplated by the invention was targeting superficial layers of the body. (Puri Decl., **Exhibit I**, Supp. Wilson Dec. at [0019-0020] and **Exhibit Q,** Wilson Opening Dec. at [17].

The Background of the Invention specifically distinguishes the patented invention from those prior art devices that are typically only targeting the superficial layers of the body (e.g., skin). For example, the '112 patent specification states: "[C]onventional smaller sized cylindrical foam rolls are typically ineffective at mobilizing the soft tissue of small soft tissue structures because they cannot effectively break up collagenous fibers therein." ('112 Patent, col. 1, ln. 51-54; *see also* '260 Patent, col. 1, ln. 66 – col. 2, ln. 2; '890 Patent, col. 1, ln. 58-61; *see also* Puri Decl., at **Exhibit I**, Supp. Wilson Dec. at [0019-0020] ("This is the main issue with conventional rollers – or those with insufficient depth of penetrating nodules – as their large contact surface area applies a general compressive force which is dissipated in the superficial layers of the human body with no therapeutic benefit to the soft tissue being achieved.").

Of note, during prosecution of Sea Ties' '933 Patent, the inventor defined "soft tissue" as excluding the surface tissue of the human body (i.e., skin and fat) in order to obtain an allowance

to the '933 Patent.  In the inventor's own words to the USPTO Patent and Trial Appeal Board: "To redesign the cited references to provide a different type of massage, **deep (soft) tissue** rather than <u>surface</u> tissue, is not mere arrangement of known parts to another known equivalent configuration.  It would result in the reference taking on entirely new capabilities, and would change the type of massage offered by the device and its effectiveness."  Puri Decl., **Exhibit D** (emphasis added).  The inventor further argued to the Board that:  "In the same Advisory Action, the Examiner further asserted that '*The type of massage (e.g., **superficial tissue massage or deep soft tissue massage**) is dependent on the amount of force provided for the massage.*'  Applicant respectfully disagrees."  Puri Decl., **Exhibit D** (emphasis added).  As shown, the inventor was clearly pointing to the soft tissue as being deeper than the superficial layers of the human body (i.e., skin and fat).  Thus, Sea Ties' proposed construction of soft tissue is in direct conflict with their own representations viz. the inventor Ron Johnson that were made to the USPTO to secure the Sea Ties' '933 Patent.

Accordingly, because it is consistent with the claims, the specification, the USPTO's findings, and the very purpose of the invention, Plaintiff's proposed construction should be adopted.  Defendant's overly broad construction should be rejected.

### 2.    "configured to"

| Claim Term | Location in Patent(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| "configured to" | '167 : Claims 1, 2, 3, and 4 '112 : Claims 1 and 12 '890 : Claim 1 '260 : Claim 1 | Term of art requiring a specific structure configured to accomplish the claimed objectives. | Capable of |

Both the Federal Circuit, and the Patent Trial and Appeal Board (PTAB) of the USPTO have consistently ruled that the term "configured to "requires structure **configured or designed to** accomplish the claimed objectives."  *See Accalarent, Inc. v. Albritton*, Case IPR2-17-00498

(Patent Tr. & App. Bd. July 9, 2018), 2018 WL 3374755, at *6 (emphasis added); *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012).  In this case, the claimed objectives of the "configured to" language in the '167, '112 and '890 Patents are to "extend into soft tissue of a user to enhance mobilization of soft tissue and optimize body core strength balance training."  In regard to the '260 Patent, the claimed objective is to "extend into soft tissue of a user."  The structure identified in the claims all of four patents configured to accomplish the claimed objectives is the plurality of shaped or solid projections.

In *Acclarent*, the PTAB even acknowledged that a presumption exists with the term "configured to" to "connote[] the narrower meaning of requiring structure configured or designed to accomplish the clamed objectives." The PTAB in *Acclarent* rejected the petitioner's broader construction proposed in this case of "configured to" to mean "capable of."  According to the PTAB in *Acclarent:* "the facts here fit comfortably within the precedent ***rejecting*** the 'capable of' construction in favor of the narrower construction. First, the claim language itself supports the narrower construction by using the 'construed to' and 'adapted to' language.  *The precedent makes clear that the 'configured to' phrase itself connotes the narrower meaning simply presumes this is the case.*"  *Id.* at *6 (emphasis added).  Similarly, in *Aspex Eyewear*, 672 F.3d at 1349, the court treated "configured to" as synonymous with the narrower "made to" and designed to" phrases. These competing constructions are the central dispute between the parties.

In other cases involving claim terms like "adapted to" (which are frequently compared to "configured to"), the courts have looked to the intrinsic evidence – the patent itself, including the claims, specification, and drawings - in determining whether the narrower definition, as proposed by Performance Solutions, or the broader definition, as proposed by Sea Ties, should be adopted. In each of these cases, the court construed "adapted to" to have the narrower meaning of "configured to" "made to" or "designed to."  *See, e.g., In re Man Machine Interface Technologies*

*LLC,* 822 F.3d 1202, 1286 (Fed. Cir. 2016); *see also In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014) ("We have noted that, 'the phase 'adapted to' is frequently used to mean 'made to,' 'designed to,' or 'configured to,' … Although the phrase can also mean "'capable of' or 'suitable for,' here the written description makes clear that 'adapted to,' as used in the '261 application, has a narrower meaning, *viz.,* that the claimed machine is **designed** or **constructed** to be used as …") (emphasis added).

The specifications of the Performance Solutions patents provide ample guidance that the narrower meaning for the term "configured to", as proposed by Performance Solutions, should be adopted.  With reference to all four Performance Solutions patents, the specification provides extensive teachings about how the claimed *structure* (i.e., the plurality of shaped or solid projections) is made or designed to accomplish the claimed objectives.  That is, these patents describe the use of particular materials, heights, and shapes (among other characteristics) of the projections to enable the projections to extend into the soft, muscular tissue of the user in order to enhance mobilization of the soft tissue and optimize core strength and balance training.

For example, the specifications of the '112, '890 and '260 patents state that, "Each of the plurality of shaped projections 14, FIGS. 1-9B, preferably radially, extends about 1/8 inch to about 3 inches from body 12, e.g., as shown by r-70, FIG. 2." ('112 Patent, col. 6, ln. 9-29).  The '167 patent states that, "protrusions 16 may extend more or less than 3/8" from overlay 13 as needed to maximize soft tissue mobilization, and improve balance and core strength training."  The patents also describe how density of the projections play a factor in achieving the claimed objectives.  *See e.g.,* '112 Patent, col. 3, ln. 34-48.  In addition, the patents further describe how the shape of the projections play a factor in achieving the claimed objectives.  *Id.*

The specification further explains how the use and placement of the projections overcome the instability problems with the prior art smooth rollers that, in turn, optimize body core strength

and balance training: "When used for body core strength and balance training, the user typically stands or [sits] (*sic*) on the cylindrical foam roller device to enhance balance, coordination and core strength. However, because the user can easily fall off the cylindrical shaped foam roll, the effectiveness of the body core strength and balance training is often minimized. ('112 Patent, col. 1, ln. 40-45).

Consistent with the rulings in *Acclarent, Aspex, Gianelli and In re Man,* here the specifications of the patents contain specific disclosures regarding the details of the structures that have been specifically designed to perform the claimed functions of extending into soft tissue, soft tissue mobilization, balance training and core strengthening. Accordingly, Plaintiff's proposed construction of "configured to" should be adopted. Defendant's proposed construction ignores the claimed functionality, ignores the structures disclosed in the specification, and is contrary to the Federal Circuit's and PTAB's findings in similar cases. Defendant's proposed construction should be rejected.

3.    "two piece"

| Claim Term | Location in Patent(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| "two piece" | '167 : Claim 1<br>'112 : Claim 1 | Two piece, including a first piece core which can comprise one or more sections that are adhesively bonded | "entirety formed from two pieces of material" |

Plaintiff's proposed construction for "two piece" is consistent with the use the term in the specification of the patents. The patents describe the claimed massage roller products as being comprised of two parts: (1) a cylindrically shaped core, or body; and (2) an overlay surrounding that core. This characterization is clear from the claims themselves which recite: "A *two piece* therapeutic, fitness, and sports enhancement device consisting of:  a *first piece* including an entirely cylindrically shaped core …; and a *second piece* including an overlay about the

cylindrically shaped core, …" ('167 patent, claim 1) (emphasis added).  Claim 1 of the '112 patent also contains essentially identical language.

Importantly, the patent specifications also describe embodiments in which the first piece – the cylindrically shaped core, or body – is composed of multiple sections that are bonded to each other using a high bonding adhesive:  "This invention also features a therapeutic, fitness, and sports enhancement device including ***a cylindrically shaped body including a plurality of bonded sections*** …. In one embodiment, ***the plurality of bonded sections may be bonded to each other using a high bonding adhesive***." ('167 Patent, col. 2, ln. 51-58) (emphasis added).  Here again, the '112 patent also contains nearly identical language.  ('112 Patent, col. 8, ln. 65 – col. 9, ln. 6).

An example of a foam roller composed of bonded sections is also shown in the figures of the patents.  For example, Figure 2 of the '167 patent shows one piece foam roller composed of 4 adhesively bonded sections:



FIG. 2

In the figure, items 19, 21, 23, and 25 show the 4 sections of the roller that are adhesively bonded together.  (*See* '167 Patent, col. 6, ln. 3-5).  The same image appears in the '112 patent as Figure 15.  ('112 Patent, col. 8, ln. 65 – col. 9, ln. 6).

Defendant's proposed construction is an attempt to improperly exclude a cylindrical core composed of anything other than a single section of foam.  In other words, Defendant seeks to improperly exclude a preferred embodiment and limit the scope of the claims to cover only foam rollers in which the inner cylindrical core is made from a single section of foam and contains no adhesive whatsoever.  This argument is directly contrary to the claims, the specification, and the

figures of the patents.  Instead, under Defendant's desired interpretation, a foam roller according to Claim 1 of the '167 or '112 patent in which the cylindrical core was composed of multiple adhesively bonded sections would not be "formed entirely from two pieces of material".  Similarly, under Defendant's interpretation, the foam roller shown above from Figure 2 of the '167 patent (and Fig. 15 of the '112 patent) would not be a ***one piece*** foam roller, but a ***four piece*** foam roller.

Defendant's proposed construction finds no support in the patents, and instead is directly contradictory to the claims, specifications, and figures of the patents.  Defendants' proposed construction should thus be rejected.  And because Plaintiff's proposed construction directly tracks the teachings of the patents, it should be adopted by this Court.

    **4.**    **"cylindrically shaped core"**

| Claim Term | Location in Patent(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| "cylindrically shaped core" | '167 : Claim 1<br>'112 : Claims 1 and 7<br>'890 : Claim 1<br>'260 : Claims 1, 5, and 18 | A cylindrically shaped structure surrounded by an overlay | Solid central material of circular cross-section free of transverse or longitudinal channels |

Plaintiff's proposed construction of "cylindrically shaped core" closely tracks the claim language, the specifications, and the figures of the patents.  Each of the Performance Solutions patents claims a foam massage roller composed of two parts: (1) a cylindrically shaped core, or body, and (2) an overlay surrounding that core.  This essential structure is clearly articulated in the claims of the patents: A ***two piece*** therapeutic, fitness, and sports enhancement device consisting of: a first piece including an entirely ***cylindrically shaped core*** …; and a second piece including an ***overlay*** about the cylindrically shaped core, … ('167 patent, claim 1) (emphasis added).  Claim 1 of the '112 patent also recites a device including a cylindrically shaped core and an overlay.

Plaintiff's proposed construction thus describes precisely what is claimed: (1) a cylindrically shaped core structure, and (2) an overlay surrounding the core.  Defendant's proposed

construction seeks to add multiple limitations into the claim language despite a complete lack of support for such limitations. Indeed, the intrinsic evidence cited by Defendant supports Plaintiff's proposed construction, not Defendants: "In another embodiment, therapeutic, fitness, and sports enhancement device 10, Fig. 16, of this invention includes cylindrically shaped core 12 and overlay 13 about core 12." ('112 Patent, col. 9, ln. 16-18) (*cited by Defendant*, Rec. Doc. 100-1 at 10).

Defendant's proposed construction includes no fewer than **three** additional claim limitations for which there is no support. **First**, Defendant's proposed construction includes the limitation that the "cylindrically shaped core" be "solid". But the only place the word "solid" appears in any of the Performance Solutions patents is in reference to the projections on the overlay, not the cylindrical core. (*See*, e.g., '112 Patent, Claim 1; '890 Patent, Claim 1; '260 Patent, Claim 1).

**Second**, Defendant's proposed construction adds the limitation of a "circular cross-section". This is also improper. As an initial matter, a "cylinder" need not have a circular cross-section. The specific type of cylinder with a circular cross-section is known as a "right circular cylinder." But in general, the cross-section of a cylinder can be any shape. A "cylinder" is characterized only by having a generally uniform cross-section through its length. (*See* Copley Decl. (**Exhibit 2**) ¶¶ 15-23). According to Dr. Copley: "A loose definition of cylinder, as found in some dictionaries, and certainly in casual conversation, is in fact the right circular cylinder. However, in the context of patents, language is expected to be used precisely, and therefore the word "cylinder" must be taken to encompass the more precise and accurate definition. More specifically, the cross-section can be any shape, so long as it is generally the same along the length of the cylinder." (Copley Decl. ¶ 19)

Moreover, the requirement of a "circular cross-section" is directly contrary to the teachings of the specification. For example, Fig. 3 of the '890 patent shows the following massage foam

roller:



Despite the clearly non-circular cross-section of the foam roller shown in the figure, the '890 patent is unambiguous in its description: "[i]n this example, cylindrically shaped body 12, Fig. 3, preferably has a length 1-31, …". ('890 patent, col. 6, ln. 13-15) (*See also*, Fig, 3 of '167, '112, or '260 patents an accompanying descriptions). Plaintiff's attempt to add the limitation of a "circular cross-section" should thus be rejected.

**Third**, Defendant's proposed construction seeks to exclude cylindrical foam rollers featuring "transverse or longitudinal channels." But for the same reasons that a cylinder need not have a circular cross-section, it also need not be free of transverse or longitudinal channels. Here again, one need look no further than Figure 3 of the '890 patent (or the '167, '112, or '260 patents) to understand that the claimed "cylindrically shaped core" can include transverse or longitudinal channels. Additionally, in addition to the patents disclosing longitudinal channels in the cylindrical foam roller above, the patents also disclose transverse channels as shown in Fig 8E of the patents (reproduced below)



*FIG. 8E*

(*See also* Copley Decl. ¶¶ 15-23).

Defendant's proposed construction seeks to import multiple additional limitations that are

14

inconsistent not only with the specification of the patents, but with the very definition of a cylinder. Accordingly, it should be rejected, and Plaintiff's proposed construction should be adopted.

5.    **"closed cell foam"**

| Claim Term | Location in Patent(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| "closed cell foam" | '167 : Claim 1<br>'112 : Claim 1<br>'890 : Claim 1<br>'260 : Claim 1 | A foam wherein the majority of the cells have gas forming discrete pockets with each pocket completely surrounded by a solid material | Chemically cross-linked polyethylene foam having an inflexible hardness and strength of plastic |

As the inventor of the Performance Solutions' patents had specifically discussed with the USPTO during prosecution of the '167 Patent, a "closed cell foam" is one in which the majority of the foam cells have gas forming discrete pockets with each pocket completely surrounded by a solid material as compared to an "open cell foam.". Puri Decl., **Exhibit J** ('167 Response to Office Action dated 2/3/16). This definition is fully supported by Performance Solutions' expert Dr. Chris Scott. *See* Scott Decl. (**Exhibit 1**) at ¶¶ 42-44. A closed cell foam can be made of different materials and using different methods, and can have different hardness and other material properties. Defendant's proposed construction that includes specific requirements on chemical cross-linking, hardness, and strength, thus again seeks to import additional limitations not present in the patent claims. Like Defendant's other proposed constructions, which also add extraneous limitations, Defendant's proposed construction of "closed cell foam" should also be rejected.

Defendant's proposed limitation that a closed cell foam be "chemically cross-linked" is squarely contrary to the teachings of the specifications of the patents. Indeed, the specifications state that a "chemically cross-linked" foam is only one example of the kinds of materials that can be used in the claimed inventions. According to the specifications, "[b]ody 12 with projections 14 is *preferably* made out of a pliable material, e.g., a closed-cell foam material, e.g., a chemically

15

cross-linked closed-cell polyethylene foam". ('890 patent, col. 5, ln. 58-60; *See also* '112 patent, col. 5, ln. 48-50; '260 patent, col. 5, ln. 63-65; '167 patent, col. 5, ln. 58-61) (emphasis added). However, this **preference** is not a claim limitation. The patents themselves make this clear, stating that **"[o]ther similar type of pliable materials and closed-cell foams** known to those skilled in the art may also be used to manufacture the device." ('890 patent, col. 5, ln. 65-67; *See also* '112 patent, col. 5, ln. 55-57; '260 patent, col. 6, ln. 3-5; '167 patent, col. 5, ln. 63-65) (emphasis added).

Additionally, Defendant's argument that a "closed cell foam" must have "inflexible hardness and strength of plastic" also contradicts the plain language of the specification. In the very same paragraph in which the specifications state that closed cell foams *other* than chemically cross-linked closed-cell polyethylene foam can be used, they also describe the cylindrical core as being made of a "pliable material, e.g., a *closed-cell foam* material." ('890 patent, col. 5, ln. 58-60; *See also* '112 patent, col. 5, ln. 48-50; '260 patent, col. 5, ln. 63-65; '167 patent, col. 5, ln. 58-61). Such a material would be the opposite of one having have "inflexible hardness and strength of plastic", as Defendant's proposed construction would require. Accordingly, Defendant's proposed construction should be rejected.

### 6.    "configured to extend into soft tissue of a user"

| Claim Term | Location in Patent(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| "configured to extend into soft tissue of a user" | '167 : Claim 1<br>'112 : Claim 1<br>'890 : Claim 1<br>'260 : Claim 1 | Defendant improperly parses the claim in a manner that takes the words out of context without including the additional functional language of the claims. "Configured to" should be construed as set forth by Plaintiff (*supra*). | Projections that do not deform, conform, or compress so as to press into soft tissue |

As described above, where the patents include "configured to" language, such language

16

must be construed to require a specific structure designed to accomplish the claimed objective. Here, as above, the structure is the massage projections of the foam roller. The claimed objectives for Claim 1 of the '167, '112 and '890 patents are: "extend into soft tissue of a user to enhance mobilization of soft tissue and optimize body core strength and balance training"; and for Claim 1 of the '260 patent: "extend into soft tissue of a user." Defendant's proposed construction ignores *all* of these objectives and instead focuses on a set of physical characteristics of the claimed projections that directly contradicts the claim language.

Defendant's construction also improperly seeks to add a limitation that the projections "do not deform, conform or compress". This proposed construction is not only unduly narrow and would render other claims meaningless. As an initial matter, the claimed projections can be made of closed cell foam, rubber, and plastic materials that, by their very nature, *can* deform, conform, or compress. They are not metal or glass, for example. With reference to all four patents, the specification unequivocally states that the projections may be made of a ***pliable material***: "The cylindrically shaped body and the ***projections may be made of a pliable material***. ***The pliable material may include a closed-cell foam material.*** The closed-cell foam material may include a chemically cross-linked polyethylene foam. ***The pliable material may include expandable polyethylene. The pliable material may include plastic.***" ('112 Patent, col. 3, ln. 11-16; '260 Patent, col. 3, ln. 28-32; '890 Patent, col. 3, ln. 18-24) (emphasis added). Additionally, the dependent claims of the '167 (claims 15-16), '112 (claims 7-8), '890 (claim 4), and '260 patents (claim 5) recite projections that are made of pliable material. But Defendant's proposed construction does not permit projections that deform, conform, or compress, and would thus <u>**exclude**</u> projections made of pliable material, rendering all of these dependent claims meaningless. Defendant's proposed construction is thus contrary to the claim language itself, leads to the result of meaningless claims, and should be rejected.

Sea Ties appears to be relying on an argument made during prosecution of the inventor's one-piece roller patent, US Patent No. 9,345,921, where the inventor distinguished the prior art by stating that "Daugherty teaches and discloses an elastic <u>deformable</u> body designed to <u>conform and collapse</u> to the shape of the foot." *See* Puri Decl., at **Exhibit K**. The inventor further explained to the USPTO that "Because the foam body of Daugherty collapses about the foot during use, it creates excess pressure on the sides of foot which would restrict free movement on the foot and prevent mobilization of soft tissue as recited in applicant's claim 1." The inventor's arguments had nothing to do with the projections on the prior art device, but rather that the foot roller device in Daugherty caused the foot to collapse in the device preventing any mobilization of soft tissue, which is far different from the patented invention which enables to device with the projections to extend into and mobilize soft tissue. Accordingly, Sea Ties' construction should be rejected.

7.    "pliable"

| Claim Term | Location in Patent(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| "pliable" | '167 : Claims 15, 16, 17, and 18<br>'112 : Claims 7 and 8<br>'890 : Claim 4<br>'260 : Claims 5 and 6 | A material that bends freely or repeatedly without breaking | Plastic material |

Plaintiff's proposed construction of "pliable" is consistent with the language of the claims and the specifications of the patents, and with the established meaning of the word. For example, Websters' Dictionary defines "pliable" as "easily bent or shaped", "malleable", and "adaptable to change". *See* Puri Decl., at **Exhibit F.** Performance Solution's construction describes physical attributes that are associated with a pliable material and as further described in Dr. Scott's expert declaration, Performance Solutions' construction does not introduce confusion or redundancy, and does not import limitations from the specification into the claims. *See* Scott Decl., **Exhibit 1**, at para. 60.

In this regard, the specifications of the Performance Solutions' patents include examples of the types of pliable materials contemplated by the patented invention, which include use of a closed cell foam, plastic or rubber.  The specifications of the patents similarly make clear that plastic is merely one type of available pliable material.  Referring again to the '112 patent:

> The cylindrically shaped body and the projections *may be made of a pliable material*. *The pliable material may include a closed-cell foam material.* The closed-cell foam material may include a chemically cross-linked polyethylene foam. *The pliable material may include expandable polyethylene.  The pliable material may include plastic*.  ('112 Patent, col. 3, ln. 11-16) (emphasis added);

> Body 12 with projections 14 is *preferably made of a pliable material*, e.g., a closed-cell foam material, e.g., a chemically, cross-linked closed-cell polyethylene foam, such as MINICEL L200, L300 or L380, available from Sekisui Voltek (Lawrence, Mass.).  In other examples, *body 12 may be made of expandable polyethylene (EPE) or a plastic type material* using foam fabricators, as known by those skilled in the art. *Other similar type of pliable materials and closed-cell foams known to those skilled in the art may also be utilized* to manufacture device 10. ('112 Patent, col. 5, ln. 48-57) (emphasis added) (*See also* '167 Patent, col. 3, ln. 61-65, col. 5, ln. 58-65; '260 Patent, col. 3, 36-32, col. 5, ln. 63 – col. 6, ln. 5; '890 Patent, col. 3, ln. 18-24, col. 5, ln. 58-67).

By contrast, Defendant's proposed construction not only again seeks to place undue limits on the term, it also contradicts the claim language and the clear teachings of the patent specifications. The use of the term "pliable" in the claims of the patents makes clear that a "pliable" material *includes* plastic, but is not *limited to* plastic.  Illustratively, with reference to the '112 patent, claims 7-11 claim (emphasis added): 7. The device of claim 1 in which the cylindrically shaped core and the projections are made of a pliable material; 8. The device of claim 7 in which the pliable material includes a closed-cell foam material. 9.  The device of claim 8 in which the closed-cell foam material includes a chemically cross-linked polyethylene foam. 10. The device of claim 1 in which the pliable material includes expandable polyethylene.11. The device of claim 1 in which the pliable material includes plastic.

Thus, even within the claims themselves, "pliable" is defined to include not only *plastic*, as suggested by Defendant, but also *closed-cell foam*, and *expandable polyethylene*.  Moreover,

while the claims of all of the Performance Solutions patents offer different potential **pliable** materials, only the '112 and '260 patent claims even offer plastic as one such material.  In the '167 and '890 patents, there is no claim in which the pliable material must even **include** plastic, much less be composed entirely of plastic.  (*See* '167 patent, Claims 15-18; '260 patent, Claims 5-9; '890 patent, Claims 4-6).

Defendant's proposed construction thus contradicts the plain language of the specification and the claims and should be rejected. While certain **plastic** materials may have these characteristics, Defendant has previously characterized **plastic** as having "inflexible hardness and strength". (*See supra*, § IV.B.5)  Thus, Defendant's proposed construction is not only inconsistent with the intrinsic evidence, it is internally inconsistent as well.  Plaintiff's proposed construction of "pliable" should be adopted.

### 8. "completely surrounding"

| Claim Term | Location in Patent(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| "completely surrounding" | '112 : Claim 1<br>'890 : Claim 1<br>'260 : Claim 1 | Completely encircling the core | A single piece of encircling material |

Plaintiff's proposed construction tracks the language of the claim and the disclosure in the patents while Defendant's proposed construction adds new claim limitations that appear nowhere in the claims or the specification.

There is no dispute that "completely surrounding" refers to an overlay "encircling the core."  Rather, the dispute is whether that overlay can include bonded sections, as expressly disclosed in the specification. Defendant's proposed limitation that the overlay be formed from a single piece of material is also inconsistent with the specification of the '112 Patent which discloses bonded sections, including in the overlay.  For example, Figures 16 and 17 of the '112 Patent show the presence of bonded sections in the overlay 13.  Defendant's reference to the "May

2, 2014 Office Action response" during prosecution of U.S. Patent No. 9,345,921 is equally unavailing. The inventor never distinguished his invention on the basis that his invention is a single piece.

In addition, Claim 1 of the '890 Patent and the '260 Patent do not have a "piece" limitation in Claim 1. The term "piece" only appears in Claim 1 of the '167 and '112 Patents. Thus, Defendant's construction requiring a single piece for the '890 and '260 Patents imposes a limitation in the claim that does not exist.

Accordingly, Defendant's attempt to add additional claim limitations through claim construction should be rejected. Plaintiff's proposed construction, which is consistent with the meaning of the term, should be adopted.

### 9. "mobilization of soft tissue"

| Claim Term | Location in Patent(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| "mobilization of soft tissue" | '167: Claim 1 and 2<br>'112 : Claim 1<br>'890 : Claims 1 | Breaking up of scar tissue | N/A |

In the course of preparing this opening brief, the issue over the proper construction of "mobilization of soft tissue" came to light. On February 4, 2022, Performance Solutions provided a proposed construction to Sea Ties of this term and included a list of evidentiary support for the proposed construction of this term. *See* Puri Decl., **Exhibit L**. Sea Ties refused to negotiate any construction of this additional claim term, despite the fact that Plaintiff's request to have a single additional claim term construed is not out of the ordinary, and does not impose any additional burden on Sea Ties. *See* Puri Decl., **Exhibit M**; *see TNS Media Research, LLC v. TiVo Research & Analytics, Inc.*, 2014-1668, at *40 (Fed. Cir. Sep. 16, 2015) ("[P]arties in patent cases frequently stipulate to a construction or the court construes a term, only to have their dispute evolve to a point

where they realize that a further construction is necessary.") (*quoting GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014)); *see also Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1360 (Fed. Cir. 2008). In response, Performance Solutions indicated that it would be willing to consider any reasonable proposal for additional time for Sea Ties to file its claim construction brief in light of this additional term. But Sea Ties never responded to Performance Solutions' invitation.

"For claim construction purposes, the [specification] may act as sort of a dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979 (Fed. Cir. 1995). The specification provides a clear and specific definition of mobilization of soft tissue which states that "[m]obilization of soft tissue by projections 14 massages soft tissue **and breaks up scar tissue**. ('112 Patent, col. 8, ln. 18-22; '167 Patent, col. 5, ln. 37-41; '890 Patent, col. 8, ln. 29-33; '260 Patent, col. 8, ln. 33-37). Scar tissue commonly form adhesions in the human body and, to a large extent, are comprised of collagenous fibers which occur from exercise, injury, and trauma. Scarring or adhesions may develop into knots or otherwise known as trigger points.

The patents further explain how breaking up the collagenous fibers or scar tissue is accomplished using the patented invention to mobilize soft tissue. Col. 7, lines 50-56, '112 Patent states: "Fig. 11A shows an example of device 10 **being used to <u>mobilize</u> the soft tissue of Quadriceps 98**. When moved back and forth in direction 100, projections 14 extend into the soft tissue of Quadriceps 98 and **<u>mobilize</u>** Quadriceps 98. **<u>This</u> breaks up the collagenous fibers** of the Quadriceps 98, enhances flexibility and enhances distensibility of Quadriceps 98."

The patents further address how none of the prior art effectively break up collagenous fibers to mobilize soft tissue. According to the Background of the Invention (*e.g.*, '112 Patent, col. 1, ln. 51-54), "conventional smaller sized cylindrical foam rolls **are typically ineffective at mobilizing the soft tissue of small soft tissue structures because they cannot effectively break up**

**collagenous fibers therein**.”  With respect to foot rollers with projections and other similar devices, the '112 patent similarly states that:  “Conventional foot massaging devices and patient positioning devices are known which may include rolls with projections or cone shaped rolls. See, e.g., U.S. Pat. Nos. 2,039,495; 5,359,739; 5,411,470; and **6,764,456** [Doherty]. However, the rolls and devices disclosed … **fail to effectively mobilize soft tissue structures of the human body**. Plaintiff's proposed construction is identical to the definition provided in the specification for the term “mobilization”, and should thus be adopted.

The specification further emphasizes the importance of mobilizing or breaking up collagenous fibers (aka scar tissue) because it provides many important health benefits that could not be successfully achieved using any of the prior art devices.  For example, according to Col. 8, lines 21-31 of the '112 Patent: “Mobilization of soft tissue by projections 14 massages soft tissue and **breaks up scar tissue**. **This** increases flexibility of soft tissue, decreases muscle soreness, relieves joint stress, decreases neuromuscular hypertonicity, increases joint range motion and extensibility of musculotendinous junctions, optimizes soft tissue distensibility, increases neuromuscular efficiency, increases flexibility and helps maintain normal functional muscle length. These benefits enhance recovery of injuries when used as a therapeutic tool, maximize sports performance, and improved fitness.”

It is clear from this context of the specification that “mobilization of soft tissue” must encompass the breaking up of scar tissue that may occur in muscles, tendons, ligaments, or fascia that surround them.[2]  In addition, at least a dozen publications similarly recognize that mobilization of soft tissue is designed to break down or reduce adhesions (aka scar tissue).  Copies of these publications are included in Puri Declaration, **Exhibit P**.

---

[2] Adhesions that form among collagenous fibers resulting in scar tissue is addressed in **Exhibits N and P** in Puri Declaration.

10.    "longitudinal axis"

| Claim Term | Location in Patent(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| "longitudinal axis" | '260 : Claims 1 and 12<br>'890 : Claim 1<br>'112 : Claim 1 | Imaginary line along its length | Imaginary line down the center of the cylindrically shaped core |

On February 3, 2021, Performance Solutions provided Defendant with a revised construction (indicated in the table above) to see if the parties could reach an agreement on a common construction of "longitudinal axis." See Puri Decl. at **Exhibit O**. With this revised construction, it appears that the parties may not have a meaningful dispute. Having not heard back from Defendant, Performance Solutions sent a follow-up email on February 7. See Puri Decl. at **Exhibit M**. To date, Sea Ties has never responded to Performance Solutions' offer to reach a common construction on this term. Performance Solutions' construction is more consistent with the plain meaning of longitudinal axis because it defines the term by the length (i.e., longitudinal axis) of the device. In contrast, Defendant's construction includes a vague term "center" which fails to identify which center of the device that Defendant is referring to, i.e., center along the longitudinal axis or center along the latitudinal axis of the device. Moreover, claim 12 of the '260 patent refers to a "longitudinal axis of the overlay". In this context, Defendant's proposed construction, which is tied to the center of the core, makes no sense. Performance Solutions' proposed construction should thus be adopted.

## III.    CONCLUSION

For the reasons set forth above in connection with each of the disputed claim terms, Performance Solutions respectfully requests that this Court construe the disputed terms in accordance with Performance Solutions' proposed constructions.

Respectfully Submitted,

TAYLOR, PORTER, BROOKS            MAYNARD COOPER & GALE LLP
& PHILLIPS L.L.P.

/s/ Harry J. Phillips                        /s/ Ashe P. Puri
Harry Phillips                               Ashe P. Puri (*Admitted Pro Hac Vice*)
                                             Brandon H. Stroy (*Admitted Pro Hac Vice*)
                                             Sasha G. Rao (*Admitted Pro Hac Vice*)

                                             Attorneys for Plaintiff PERFORMANCE
                                             SOLUTIONS, LLC

Dated:  February 9, 2021